UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIELLE GARRETT, Personal Representative
of the Estate of MARCUS JASON GARRETT,

        Plaintiff,

v.                                     Case No. 06-10753
                                     Hon. Sean F. Cox

DETROIT MEDICAL CENTER, et al.

        Defendants.
_____

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for summary judgment. Both parties fully briefed the issues and a hearing was held February 28, 2007. For the following reasons, the Court **GRANTS** Defendants' Motion for summary judgment.

### I.    BACKGROUND

This action arises out of alleged violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA") 42 USC §1395dd.

On September 28, 2004, Marcus Garrett ("Garrett"), Plaintiff's decedent, began experiencing several symptoms including syncope, difficulty breathing, elevated heart rate, urinary incontinence, and generalized weakness. Plaintiff, Garrett's wife, called Emergency Medical Services ("EMS").

EMS arrived at approximately 7:04 a.m. EMS technicians noted low blood pressure and an abnormal pulse/heart rate. Garrett was given oxygen and IV fluids. He was transported to

1

Defendant Sinai-Grace Hospital.

Garrett arrived at Sinai-Grace Hospital at approximately 7:42 a.m.  He was triaged and designated as a "category #2."  At approximately 8:00 a.m., Defendant physicians Ronald Kim ("Kim"), a resident, and Robert Dunne ("Dunne"), the attending, saw Garrett.  Kim and Dunne performed a physical examination and took a history on Garrett.  Garrett's chief complaint was an acute episode of syncope that occurred that morning.  Garrett had no prior history of syncope. After their exam, Plaintiff alleges Kim and Dunne knew that Garrett had the following symptoms, which presented acutely: (1) syncope; (2) incontinence of urine; (3) shortness of breath; (4) tachycardia; and (5) low blood pressure.  The differential diagnosis[1] based on Garrett's symptoms included: (1) heart attack; (2) arrhythmia; (3) vasovagal episode; (4) orthostasis; and/or (5) psychiatric reasons.  However, Kim testified that pulmonary embolism was also part of his differential diagnosis.  Dunne denies that pulmonary embolism was part of his differential diagnosis.

Kim wrote orders for Garrett to have blood work, an EKG, chest x-rays, and a urinalysis. Additionally, the fluids and oxygen initiated by EMS were continued.  Kim and Dunne did not see Garrett again until approximately 1:05 p.m.

At approximately 11:45 a.m., Defendants began a pre-authorization process with Garrett's managed care provider, to transfer Garrett to Henry Ford Hospital.  Garrett had insurance through Health Alliance Plan ("HAP") and Sinai-Grace was an "out of network" hospital.  The HAP records reflect that Kim stated Garrett was stable for transfer and that Garrett was agreeable to transfer.  However, all of Garrett's test results were not back.  The vital signs

---

[1]The differential diagnosis is list of possible diagnoses based on the clinical data.

relayed to HAP were the same as those taken at Garrett's arrival at Sinai-Grace at 8:00 a.m. The reason cited for Garrett's transfer was a request by his insurance carrier.

At 1:05 p.m., Kim diagnosed Garrett with diabetic ketoacidosis. Garrett was administered additional fluids, insulin, and potassium. EMS transferred Garrett from Sinai-Grace to Henry Ford Hospital at approximately 2:33 p.m. Garrett still had an elevated pulse and heart rate and was on oxygen.

Garrett's vital signs were taken at Henry Ford Hospital at approximately 3:00 p.m. His vital signs got worse. He was found unresponsive at 3:09 p.m., and a respiratory arrest code was called at 3:10 p.m. Despite resuscitative efforts, Garrett was pronounced dead at 4:10 p.m. An autopsy revealed a pulmonary thromboembolism emanating from a deep venous thrombosis of the left leg.

On February 17, 2006, Plaintiff filed a Complaint alleging: (1) violation of EMTALA; (2) medical malpractice against Dunne under state law; (3) medical malpractice against Kim under state law; (4) negligence against Sinai-Grace under state law; and (5) vicarious liability of the Detroit Medical Center and Sinai-Grace under state law. On February 23, 2006, Judge Paul Gadola sua sponte dismissed Counts II through V, refusing to exercise supplemental jurisdiction. On November 22, 2006, Defendants filed a Motion for summary judgment on Plaintiff's remaining EMTALA claims.

## II.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).

A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have

[the] effect of establishing or refuting one of the essential elements of the cause of action or

defense asserted by the parties, and would necessarily affect application of appropriate

principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d

171, 174 (6th Cir. 1984).  The court must view the evidence in the light most favorable to the

nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.

*Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### III.    ANALYSIS

Plaintiff alleges violations of EMTALA.  EMTALA imposes the following duties on

hospitals:

> (1) To provide an appropriate medical screening examination within the capability
> of the hospital's emergency department to any individual who comes to the
> emergency department and seeks examination or treatment.  42 USC §1395dd(a).

> (2) If the hospital determines that the individual has an emergency medical
> condition, to stabilize the medical condition before transferring (or discharging) a
> patient.  42 USC §1395dd(b)(1) and (c)(1).

*Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990).  "The purpose of

EMTALA is to prevent hospitals from failing to provide medical screening to uninsured

individuals that would have been provided a paying patient and to prevent transfer or discharge

without taking steps that would have been taken for a paying patient." *Stringfellow v. Oakwood

Hospital*, 409 F.Supp.2d 866, 870 (E.D.Mich. 2005)(citing *Cleland*, 917 F.2d at 268).  "Congress

wanted to restore the American tradition of giving medical aid to anyone in need who appeared

on the emergency room doorstep." *Id*. (citing *Thornton v. Southwest Detroit Hospital*, 895 F.2d

1131, 1132 (6ᵗʰ Cir. 1990)).

**A.    Screening Requirement**

Plaintiff alleges that Defendants violated EMTALA because Garrett did not receive an appropriate screening.  "Appropriate" as used in EMTALA refers to the motives with which a hospital acts.  *Cleland*, 917 F.2d at 272.  "If it acts in the same manner as it would have for the usual paying patient, then the screening provided is 'appropriate' within the meaning of the statute."  *Id*.  A plaintiff fails to establish a claim for violation of the screening requirement where there is no evidence of disparate treatment based on an improper motive.  *Id*. and *Stringfellow*, 409 F.Supp.2d at 870-871.  See also *Baber v. Hospital Corporation of America*, 977 F.2d 872, 879 (4ᵗʰ Cir. 1992)("The plain language of [EMTALA] requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints."); and *Summers v. Baptist Medical Center Arkadelphia*, 91 F.3d 1132, 1139 (8ᵗʰ Cir. 1996)("a refusal to follow regular screening procedures in a particular instance contravenes [EMTALA]").

To establish her claim that Garrett received inappropriate medical screening, Plaintiff relies on language in *Cleland* that "[a] hospital that provides substandard (by its standards) or nonexistent medical screening" may be liable for an EMTALA violation.  *Cleland*, 917 F.2d at 272.  Plaintiff argues that Defendants did not follow their customary screening procedures when treating Garrett.

Plaintiff contends that pulmonary embolism was a part of the differential diagnosis compiled by Defendants. Plaintiff directs the Court to Kim's testimony:

5

Q.    You included pulmonary embolism in your differential diagnosis for Mr. Garrett?

A.    Yes.

Q.    What was your reason for including the condition of pulmonary embolism as a part of your differential diagnosis for Mr. Garrett?

A.    Again, it's a very broad differential so you have to have an open - a very wide net, so to speak, and pulmonary embolism while lower on my differential, it was still in the differential.

[Plaintiff's Response, Exhibit 8, p.53]. Kim also testified that pulmonary embolism is a life-threatening condition. *Id*. at p.54. Additionally, Kim testified:

Q.    Would you also agree that once a life-threatening condition is included as a part of a patient's differential diagnosis that reasonable measures must be undertaken to either confirm or rule out that condition?

A.    Sure.

* * *

Q.    In a patient in which a pulmonary embolism is a part of the differential diagnosis, are there tools to assist you in making that diagnosis?

A.    There are studies that can be done. Things such as a spiral CT scan of the chest or a VQ scan or an angiogram are several studies that can be done to assess for a pulmonary embolism.

Q.    Now in Mr. Garrett's case you indicated that his differential included a pulmonary embolism. Did you order any radiographic studies for the purpose of either confirming or ruling out the condition of pulmonary embolism?

A.    No. I didn't think they were - I didn't think they were warranted in this case.

Q.    And why is it that you didn't think they were warranted in this case?

A.    Again, given his history and the physical examination findings that  - physical exam findings, didn't think that any of those studies were

6

indicated.

[Plaintiff's Response, Exhibit 8, pp.54-56].

     Dunne described his process for creating a differential diagnosis:

    Q.    Describe for me what the process is of developing a differential diagnosis.

    A.    You would take the patient's history and physical and generate a series, from listening to them or, again, if they can't speak for themselves, to others.  Then you generate a list, if you will, in your head of possible causes of that patient's symptoms based on, you know, all the factors that are in front of you: Their history, their physical exam.  Whether they're male or female obviously is going to change your differential diagnosis.

    Q.    And once you've undertaken the process of developing a differential diagnosis as you have described and included as a part of your differential diagnosis the condition of pulmonary embolism, you would agree that the standard of care requires that measures be taken to either confirm or rule out that diagnosis?

    A.    * * * [] if you have suspicion after your history and physical exam that a patient has a pulmonary embolus or another disease, then you're going to pursue some workup to determine if that is what's causing the patient's chief complaint at that time.

[Plaintiff's Response, Exhibit 7, pp.41-42].   Dunne stated that if he suspected pulmonary embolism he would do a "VT scan" or a "spiral CT."  *Id*. at p.83.  However, Dunne testified that Garrett's history and physical exam did not give him a suspicion of pulmonary embolism.  *Id*. at p.85.  Accordingly, Dunne claims he did not include pulmonary embolism in his differential diagnosis.  *Id*. at p.80.

    Drawing inferences in favor of the nonmoving party, based on the testimony, there is a genuine issue of material fact whether the hospital provided substandard screening according to its own standards with respect to Garrett.  Although Dunne did not reach the same conclusion, Kim testified that pulmonary embolism was a part of his differential diagnosis. [Plaintiff's

7

Response, Exhibit 8, p.53]. Kim also testified that pulmonary embolism is a life-threatening condition, and when a life threatening condition is included as part of a patient's differential diagnosis reasonable measures must be undertaken to either confirm or rule out that condition. *Id*. at pp.54-55. Kim went on to state that he did not order any studies for the purpose of confirming or ruling out a pulmonary embolism because he did not think they were warranted in light of his physical examination and history. *Id*. p.56. Dunne testified that nothing in his examination made him suspect pulmonary embolism and he did not include it in his differential diagnosis. [Plaintiff's Response, Exhibit 7, p.80]. However, he also testified that "if I include pulmonary embolism in my differential diagnosis, I will do some workup to rule it out." *Id*. at p.83. Both Kim and Dunne testified that a spiral CT scan or a VQ scan can be used to diagnose a pulmonary embolism. It is undisputed that Defendants did not perform additional tests for the purpose of ruling out pulmonary embolism. Therefore, there is a question of fact as to whether Defendants suspected pulmonary embolism but failed to perform their usual screening procedure to rule out the condition.

This situation is different than the cases cited by Defendants. In *Stringfellow* and *Cleland*, the reason there was no EMTALA claim is because the plaintiff essentially alleged a failure to diagnose. It is not an EMTALA violation to perform a faulty screening and fail to diagnose the patient's condition. In the cases cited by Defendant, the physician failed to suspect the condition and accordingly failed to order the appropriate tests to diagnose the condition. In this case, Plaintiff's claim is not that Defendants should have diagnosed Garrett's pulmonary embolism. Rather, Plaintiff claims that pulmonary embolism was in fact suspected, at least by Kim, yet Defendants failed to follow their usual procedure of ordering further available tests to

8

rule out pulmonary embolism.

However, this satisfies only one prong of a claim for inappropriate screening.  In the Sixth Circuit, in order to establish a claim of inappropriate medical screening, a plaintiff must also establish improper motive.  *Cleland*, 917 F.2d at 271-272; and *Stringfellow*, 409 F.Supp.2d at 870-871.  Plaintiff points out that Defendant Sinai-Grace hospital was "out of network" for Garrett's insurance. [Response, p.18].  Presumably, HAP would not pay the same level of benefits for Garrett's treatment at Sinai-Grace, as it would at an "in network" hospital.  Plaintiff claims that the only reason Garrett was transferred from Sinai-Grace to Henry Ford Hospital was at the request of his insurance carrier. [Plaintiff's Response, Exhibit 13].  Plaintiff further asserts that the process to transfer Garrett began before his medical screening was complete.  Based on these facts, Plaintiff concludes that a question of fact exists as to Defendants' motive for treating Garrett differently.

Defendants' allege that Plaintiff "has simply not presented any evidence in this case, beyond conjecture, that the Defendant-hospital or its agent acted with an improper motive..." [Reply, p.3].

Plaintiff fails to establish a genuine issue of material fact regarding whether Defendants had an improper motive for treating Plaintiff differently.  Reasons that constitute an "improper motive" for purposes of liability for an inappropriate screening claim include, but are not limited to, "race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc." *Cleland*, 971 F.2d at 272.  The only evidence presented by Plaintiff is that Sinai-Grace transferred Garrett in accordance with HAP's request.  There is no evidence that Defendants improperly initiated the transfer.  There is no evidence that this was an unusual procedure.  There

9

is no evidence that Defendants delayed treatment to Garrett in order to effectuate the transfer.

Although Garrett was "out of network" for purposes of his insurance coverage, several tests were

ordered and a diagnosis was made.  Moreover, his screening was performed by Kim and Dunne

shortly after his arrival at 8:00 a.m., well before the pre-authorization process began at 11:45 a.m.

Most importantly, there is no evidence to suggest that if Garrett were not "out of

network" the tests to rule out pulmonary embolism would have been ordered.  Dunne testified

that based on Garrett's physical exam and history, nothing made him suspect pulmonary

embolism. [Response, Exhibit 7, p.80].  Kim testified that although pulmonary embolism was in

his list of possible diagnoses, he did not order additional tests because he did not believe the

history and physical examination warranted further studies. [Response, Exhibit 8, p.56].  There is

no evidence to support an inference that these actions were based on Garrett's "out-of-network"

status.

Therefore, although Plaintiff creates a genuine issue of material fact on whether

Defendants followed their usual procedure with respect to the suspicion of pulmonary embolism,

Plaintiff does not establish a claim for inappropriate screening under EMTALA because Plaintiff

does not offer any evidence of improper motive.

At the hearing, counsel for Plaintiff hinted that there was further discovery pending.

However, Plaintiff did not submit an affidavit pursuant to Fed.R.Civ.P. 56(f).

**B.      Stabilization Requirement**

Plaintiff asserts that Defendants violated EMTALA by transferring Garrett to Henry Ford

Hospital while he had an emergency medical condition.  In order to sustain a claim, Plaintiff

must establish that Defendants had actual knowledge of Garrett's emergency medical condition.

10

As noted in *Stringfellow*:

> 'If the emergency nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition.' *Cleland*, 917 F.2d at 271.  The language of [EMTALA] itself states that the protections of the requirement to stabilize before discharge or transfer do not apply until the hospital 'determines' the individual has an emergency medical condition.  42 USC §1395dd(b)(1).  *See also Thornton*, 895 F.2d at 1134 (Once a patient *is found* to suffer from an emergency medical condition, the hospital must give the patient treatment to stabilize that condition...)(emphasis added); [and] *Cleland*, 917 F.2d 266 (If the condition was not *ascertained* even though an appropriate screening was provided, then the hospital could not have violated its duty to stabilize.)(emphasis added).

*Stringfellow*, 409 F.Supp.2d at 871(emphasis original); see also *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003)("This court has long held that liability under section (b) requires actual knowledge of the condition.").

Both Kim and Dunne testified that Garrett did not have an emergency medical condition. See Plaintiff's Response, Exhibit 8, pp.80-81 and Exhibit 7, p.119.  Plaintiff does not present any evidence that Defendants knew Garrett had an emergency medical condition that was not stabilized at the time of his transfer to Henry Ford Hospital.  The only known medical condition was the diagnosis of diabetic ketoacidosis.  Plaintiff does not contend that this condition was an emergency medical condition that was not stabilized at the time of transfer.  Rather, Plaintiff argues that because pulmonary embolism was a part of the differential diagnosis, which can be an emergency medical condition, Defendants should have conducted further tests to determine if Garrett did in fact have a pulmonary embolism before transferring him.  What Plaintiff argues is that Defendants should have known that Garrett had an emergency medical condition, *i.e.*, pulmonary embolism, if they had followed the proper standard of care.  This is a classic claim of medical malpractice, not a violation of EMTALA.  In order to fail to stabilize an

11

emergency medical condition, a defendant must know that there is such a condition to be stabilized.  Plaintiff fails to present evidence that Defendants had such actual knowledge. Inclusion in a differential diagnosis, which is a list of *possible* diagnoses, does not equate to a *determination* that a patient actually has a particular condition sufficient to support liability under EMTALA.  Thus, Defendants are entitled to summary judgment on Plaintiff's claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for summary judgment.


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 14, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 14, 2007, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager